James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com
*Attorneys for Plaintiffs (see signature block)*

Tyler Smith, OSB No. 75287
TYLER SMITH & ASSOCIATES PC
181 N. Grant Street Suite 212
Canby, OR 97013
Tel:  503-266-5590
Fax:  503-213-6392
E-mail:  tyler@ruralbusinessattorneys.com
*Attorney for Plaintiffs (see signature block)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| OPEN OUR OREGON, DA CIELO LLC, THE MOUNT HOOD MIXER SHOP, INC., UNDER THE SKIN TATTOO LLC, BRYANT LLC, KUEBLER'S FURNITURE, INC., KATHY SALDANA, as an individual; MICHELE KARPONTINIS, as an individual; and DAVID PARSON, as an individual, | No. **PLAINTIFFS' COMPLAINT** |
| Plaintiffs, | |
| v. | |
| KATE BROWN, in her official capacity as the Governor of the State of Oregon, LILLIAN SHIRLEY, in her official capacity as Public Health Director of the State of Oregon, | |
| Defendants. | |

For their complaint, plaintiffs allege:

1.      Plaintiff Open Our Oregon is an Oregon nonprofit based in Hood River, Oregon, organized to assist Oregon businesses in combatting the Governor's shutdown orders.

2.      Plaintiff Da Cielo LLC is an Oregon limited liability company formerly operating a salon in the Pearl District in Portland, whose business has been shut down by defendants' conduct as alleged herein.

3.      Plaintiff Bryant LLC operates the Why Not Bar & Grill in Yoncalla, Oregon, whose business has been shut down by defendant's conduct as alleged herein.

4.      Plaintiff Hood River Mixer Shop, Inc. operates liquor stores in Hood River and The Dalles, Oregon, the business of which has been substantially injured by defendant's conduct as alleged herein.

5.      Plaintiff Under the Skin Tattoo LLC operated a tattoo and body piercing studio in Hood River, Oregon, shut down by defendants' conduct as alleged herein.

6.      Plaintiff Kuebler's Furniture, Inc. operated a furniture store in Salem, Oregon until shut down by defendants' conduct as alleged herein.

7.      Plaintiff Kathy Saldana operated two bars, Quins Bar in Ontario, Oregon and the A Street Tavern in Vale, Oregon until shut down by defendants' conduct as alleged herein.

8.      Plaintiff Michele Karpontinis operated a retail store, Lotus House, selling lingerie in Roseburg, Oregon, until shut down by defendants' conduct as alleged herein.

9.      Plaintiff David Parson operated a 24-hour gym, PDX Muscle, in Beaverton, Oregon, until shut down by defendants' conduct as alleged herein.

10.     Defendant Kate Brown is made a party to this action in her official capacity as the Governor of the State of Oregon.  Article V, § 1 of the Constitution of the State of Oregon vests the " executive power of the State" in the Governor.

11.     Defendant Lillian Shirley is made party to this action in her official capacity as Public Health Director of the State of Oregon.  The Director has statutory powers under ORS 433.443 to order "public health measures appropriate to the public health threat presented" and to take enforcement actions including "the imposition of civil penalties of up to $500 per day" for failure to comply with such orders, and additional authorities as set forth in ORS 431A.015.

## Jurisdiction and Venue

12.     This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 & 1367.  Venue is appropriate insofar as some of the plaintiffs are in this District and defendants are in this Division.

13.     28 U.S.C. § 2201 provides that "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

## The Governor's COVID-19 Response

14.     On March 8, 2020, finding that there were "14 presumptive or confirmed coronavirus cases in Oregon, 430 cases in the United States, and 101,927 cases worldwide," the Governor issued Executive Order No. 20-03.  The Governor reported that the U.S. Centers for Disease Control and Prevention had reported that "COVID-19

presents a 'high' potential health threat," and declared that these circumstances constituted a statewide emergency under ORS 401.025(1) ("'Emergency' means a human created or natural event or circumstance that causes or threatens widespread loss of life, injury to person or property, human suffering or financial loss).

15.    Among other things, Executive Order No. 20-03 directed the Oregon Health Authority and the state Public Health Director to issue "guidelines for private businesses regarding appropriate work restrictions, if necessary," and stated that "all citizens are to heed the advice of emergency officials with regard to this outbreak to protect their health and safety".

16.    Executive Order No. 20-03 provided that the state of emergency shall exist for sixty days unless extended.

17.    On March 12, 2020, the Governor issued Executive Order No. 20-05, prohibiting "large social, spiritual, and recreational gatherings of 250 people or more" in any circumstances where "a distance or at least three (3) feet between individuals cannot be maintained".

18.    On March 17, 2020, the Governor issued Executive Order No. 20-07, barring "restaurants, bars, taverns, brew pubs, wine bars, cafes, food courts, coffee shops, clubs or other similar establishments that offer food or drink" from "offer[ing] or allow[ing] on-premises consumption of food or drink".

19.    Executive Order No. 20-07 also replaced the 250 person limit in Executive Order No. 20-05 to gatherings of 25 people or more.

20.     Executive Order No. 20-07 was declared to remain in effect until April 14, 2020, and was later made of indefinite duration pursuant to Executive Order No. 20-14 (issued April 7, 2020).

21.     Executive Order No. 20-14 declared that any person "found to be in violation of this Executive Order is subject to the penalties of a Class C misdemeanor under Oregon law pursuant to ORS 401.990 ("Any person knowingly violating any provision of this chapter, or any of the rules, regulations or orders adopted and promulgated under this chapter, shall, upon conviction thereof, be guilty of a Class C misdemeanor").

22.     On March 17, 2020 the Governor also issued Executive Order No. 20-08, closing Oregon's schools, and on March 19, 2020, the Governor issued Executive Order No. 20-09, barring in-person instruction at institutions of higher education (this Order was later extended by Order No. 20-17, issued April 17, 2020).

23.     On March 19, 2020, the Governor issued Executive Order No. 20-10, prohibiting elective and non-urgent procedures at health facilities throughout Oregon to preserve personal protective equipment for emergency responders within the State.

24.     On March 22, 2020, the Governor issued Executive Order No. 20-11, suspending residential evictions throughout Oregon.

25.     On March 23, 2020, the Governor issued Executive Order No. 20-12, which declared that it "is essential to the health, safety, and welfare of the State of Oregon during the ongoing state of emergency that, to the maximum extent possible, individuals stay at home or at their place of residence" and declaring:

(a)      "Non-essential social and recreational gatherings of individuals outside a home or place of residence . . . are prohibited immediately, regardless of size, if a distance of at least six feet between individuals cannot be maintained;"

(b)      Individuals are prohibited from patronizing businesses closed [pursuant to the Order];

(c)      Closing a broad range of businesses "for which close personal contact is difficult or impossible to avoid," including:

> Amusement parks; aquariums; arcades; art galleries (to the extent that they are open without appointment); barber shops and hair salons; bowling alleys; cosmetic stores; dance studios; esthetician practices; fraternal organization facilities; furniture stores; gyms and fitness studios (including climbing gyms); hookah bars; indoor and outdoor malls (i.e., all portions of a retail complex containing stores and restaurants in a single area); indoor party places (including jumping gyms and laser tag); jewelry shops and boutiques (unless they provide goods exclusively through pick-up or delivery service); medical spas, facial spas, day spas, and non-medical massage therapy services; museums; nail and tanning salons; non-tribal card rooms; skating rinks; senior activity centers; ski resorts; social and private clubs; tattoo/piercing parlors; tennis clubs; theaters; yoga studios; and youth clubs.

(d)      Closing the operation of all other retail businesses "unless the business designates an employee or officer to establish, implement and enforce social distancing policies consistent with guidance from the Oregon Health Authority"

(e)      Threatening all businesses failing to comply with closure and/or penalties of a Class C misdemeanor under Oregon law pursuant to ORS 401.990.

26.      On March 31, 2020, the Director adopted emergency rules for implementation of Executive Order Nos. 20-07 and 20-12, expanding restrictions in and implementing the civil penalty provisions of those orders. OAR 333-003-1000 to -1040.

Plaintiffs seeking to open businesses in the State of Oregon are threatened with enforcement of these rules.

27.    On April 1, 2020, the Governor issued Executive Order No. 20-13, forbidding the state's landlords of non-residential properties from terminating leases for nonpayment.

28.    On April 15, 2020, the Governor issued Executive Order No. 20-16, directing public bodies to hold public meetings and hearings by virtual means "whenever possible".

29.    On April 17, 2020, the Governor issued Executive Order No. 20-18, suspending the garnishment of certain funds.

30.    On April 23, 2020, the Governor issued Executive Order No. 20-19, addressing child care facilities, and Executive Order No. 20-20, replacing Executive Order No. 20-08 with additional and extended school closure provisions.

31.    On April 27, 2020, the Governor issued Executive Order No. 20-22, replacing Executive Order No. 20-10 and loosening but not eliminating restrictions on "[e]lective and non-urgent procedures".

32.    On May 1, 2020, the Governor issued Executive Order No. 20-24, extending the state of emergency declared in Executive Order No. 20-03 to July 6, 2020.

### The Impacts of COVID-19 and the Executive Orders

33.    Restrictions upon the Nation's citizens were initially urged on the basis that without them, COVID-19 cases would overwhelm medical facilities, causing additional loss of live from the inability to treat afflicted citizens, with the goal of "flattening the curve" of emergency room demand.

34. Over time, forecasts of the incidence of COVID-19 and its impact have dropped dramatically. Overtime, forecasts of the fatality rate of the disease have dropped dramatically. At the same time, Medicaid reimbursement practices have created financial incentives to err on the side of attributing deaths to COVID-19.

35. Early fatality rates were based on fatalities divided by reported cases, but over time it has become apparent that there are very large numbers of unreported cases. Antibody testing in Santa Clara County, California suggested that the overall disease incidence is 54 times higher than reported cases; [1] testing in Los Angeles County, California has suggested a range 28 to 44 times higher than reported cases.[2] Even higher percentages have been reported in New York City and in foreign countries. Perhaps half of all COVID-19 infections are asymptomatic. As a result, the actual probability of dying from COVID-19 is substantially lower than the fatality rate of confirmed cases that is widely reported.

36. Oregon Health Authority Data as of May 10, 2020, reports fourteen patients with confirmed COVID-19 are on ventilators in Oregon, with 793 available ventilators:[3]

---

[1] https://www.medrxiv.org/content/10.1101/2020.04.14.20062463v2.

[2] https://pressroom.usc.edu/preliminary-results-of-usc-la-county-covid-19-study-released/.

[3] https://govstatus.egov.com/OR-OHA-COVID-19 (Demographics, Hospital Capacity and Testing section).

| Hospital capacity and usage[⁺] | Available | Total |
|---|---|---|
| Adult ICU beds | 230 | 812 |
| Adult non-ICU beds | 1913 | 6939 |
| Pediatric NICU/PICU beds | 75 | 302 |
| Pediatric non-ICU beds | 155 | 332 |
| Ventilators | 793 | |

| COVID-19 details[⁺] | Patients with suspected or confirmed COVID-19 | Only patients with confirmed COVID-19 |
|---|---|---|
| Current hospitalized patients | 164 | 63 |
| Current patients in ICU beds | 45 | 17 |
| Current patients on ventilators | 22 | 14 |

37.    Initial fears of exponential growth of the disease have proven unfounded in Oregon, with the May 10, 2020 Oregon Health Authority showing reported cases demonstrating a declining pattern:[4]

---

[4]https://public.tableau.com/profile/oregon.health.authority.covid.19#!/vizhome/OregonHealthAuthorityCOVID-19DataDashboard/COVID-19EPIConfirmed?:display_count=y&:toolbar=n&:origin=viz_share_link&:showShareOptions=false.



38.    Defendants will assert that this pattern proves the success of the policies embodied in the Executive Orders, but there is no scientific evidence associating particular measures with particular reductions in the spread of the disease.

39.    COVID-19 visits to Oregon's emergency rooms have at all relevant times constituted a small fraction of emergency room visits, and peaked some time ago, in late March, based upon the data publicly reported by the Oregon Health Authority (as of May 10, 2020):[5]

---

[5] https://www.oregon.gov/covid19response/Daily%20Reports/Oregon_COVID-19_Daily_Update.pdf.





*Oregon ESSENCE receives daily reports of emergency department visits from all 60 non-Federal hospitals in Oregon.

  40.  These data show that whatever the effect of the restrictions in the Executive Orders, the entire set of restrictions is not necessary to prevent the overwhelming of health facilities in Oregon.  These data also show that the initial surge of cases is over, and has been for weeks.  Hospital admissions may rise again, but any relief this Court enters against existing Executive Orders need not prevent the Governor from acting again if hospitals were in genuine danger of being overwhelmed by COVID-19 patients.

41.    Defendants have caused to be prepared a number of projections of continued disease incidence, the April 29, 2020 projection asserts that contrary to all available data from other jurisdictions, the ratio of unreported cases to reported cases is only 4:1, as compared to the much, much higher results obtained everywhere else, thereby dramatically overstating the fatality rate.  It assumes an infection fatality rate of 0.8%.[6]

42.    Upon information and belief, Oregon authorities, like others in many states, are overstating the deaths caused by COVID-19 by assigning responsibility to COVID-19 notwithstanding other contributing causes, often multiple contributing causes.

43.    As of May 10, 2020, 127 total deaths are reported by the OHA.  To put the significance of these deaths in context, as compared to other causes of death in Oregon, a 2018 OHA report[7] shows thirteen other causes of death were more significant, ranging from malignant neoplasm (4,349) to nephritis (201).  There were 643 alcohol-induced deaths, but we do not declare a public emergency and ban the sale of alcohol.  There were 243 influenza and pneumonia deaths, but no emergency was declared over the seasonal flu.

44.    The Executive Orders are a departure from all prior treatment of infection disease episodes in American history.  The 1957 flu epidemic is estimated to have killed approximately 116,000 Americans, which scaled up to today's population would represent approximately 221,000 deaths.  Similarly, the 1968 flu epidemic is estimated to have killed approximately 100,000 Americans, or 165,000 based on today's population.

---

[6] https://govsite-assets.s3.amazonaws.com/29qh7dciSNeDWg42a5w2_Oregon-COVID-19-Projections-2020-04-29.pdf.

[7] https://www.oregon.gov/oha/PH/BIRTHDEATHCERTIFICATES/VITALSTATISTICS/ANNUALREPORTS/VOLUME2/Documents/2018/Table03.pdf (male deaths only).

In neither case were restrictions placed upon the livelihoods and fundamental constitutional rights of ordinary Americans.

45.     To the contrary, a long history of state and federal precedent created in response to epidemics has confirmed authority to confine individuals afflicted with contagious disease, and even force healthy individuals to be vaccinated during an epidemic.  But emergency authorities have not previously been understood to allow what is in substance mass quarantining of healthy Americans, and preservation of the most fundamental Constitutional freedoms requires that such an approach be rejected.

46.     COVID-19 continues to kill a small number of Oregonians every day, but has not caused a very significant overall rise in deaths, as demonstrated in weekly death data released by the Oregon Department of Health:[8]



---

[8] https://public.tableau.com/profile/oha.center.for.health.statistics#!/vizhome/OregonHealthAuthorityCenterforHealthStatisticsWeeklydeathgraph/Dash-weeklydeaths.

The blue line is the three-year average of weekly deaths; the orange line is 2020 weekly deaths, and the red line is actual or presumed COVID-19 deaths.  There is reason to believe that the extraordinary economic and mental health suffering caused by the Governor's orders, and associated restrictions on access to non-COVID-19, may cause a death toll that is of the same order of magnitude as COVID-19 deaths themselves, if not higher.

47.    This lawsuit challenges a small subset of the restrictions, identified below, while leaving in place provisions of the Executive Orders more likely to provide substantial protections.  For example, the Oregon Health Authority reports the following age distribution of cases as of May 10, 2020:

| Age group | Cases | Percent | Ever hospitalized‡ | Deaths* |
|---|---|---|---|---|
| 0 to 9 | 24 | 1% | 4 | 0 |
| 10 to 19 | 97 | 3% | 2 | 0 |
| 20 to 29 | 450 | 14% | 25 | 0 |
| 30 to 39 | 545 | 17% | 43 | 0 |
| 40 to 49 | 553 | 17% | 83 | 3 |
| 50 to 59 | 566 | 18% | 110 | 5 |
| 60 to 69 | 460 | 14% | 161 | 22 |
| 70 to 79 | 300 | 9% | 132 | 38 |
| 80 and over | 214 | 7% | 101 | 59 |
| Not available | 19 | 0% | 9 | 0 |
| **Total** | **3228** | **100%** | **670** | **127** |

48.     These data show that nearly half of the deaths involve the cohort of Oregon citizens over 80, and almost 94% of those over 60.  No one under forty has died.  Plaintiffs would not challenge actions such as defendants' February 29, 2020 restrictions on visitation in nursing, assisted living, and residential care facilities.  But restrictions on the entire Oregon population must be evaluated on the basis of the negligible risk of fatality for most Oregonians.

49.     Defendants may suggest that those at no risk must be confined to protect those who are at risk, but the strategy is fundamentally irrational insofar, for so long as

there is no highly-effective vaccine or treatment, the COVID-19 pandemic must be defeated the same way all viral epidemics have been:  by the acquisition of immunities in a large sector of the population that prevents further transmission (called "herd immunity").

50.    In sharp contrast to the Governor's Orders, the U.S. Centers for Disease Control and Prevention have promulgated guidance for businesses and employers[9] which emphasize that business "should plan to respond in a flexible way to varying levels of disease transmission in the community".

51.    The Oregon Legislature established that:  "It is declared to be the policy and intent of the Legislative Assembly that preparations for emergencies and governmental responsibility for responding to emergencies be placed at the local level." ORS 401.032(2).  As of May 10, 2020, twenty-four counties in Oregon have no reported COVID-19 deaths at all, and defendants are refusing efforts by many such counties to get the businesses of Oregonians opened.

52.    Defendants' decision making is irrational, unreasonable, arbitrary and capricious when viewed from many perspectives, including but not limited to:

    (a)    the irrationality of suddenly destroying the livelihoods of many thousands of Oregonians based on death rates that are not substantially higher than something we, in substance, did not even notice when it happened before in prior epidemics;

    (b)    irrational distinctions between essential and nonessential categories of Oregon businesses;

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/community/guidance-business-response.html.

(c)      failure to account for increased deaths from causes arising from the restrictions themselves, such as increased suicide;

(d) a failure to seek input from the legislative branch of Oregon as to appropriate courses of action;

(e) a failure to consult the physician community in Oregon, as to appropriate courses of action, in a context where the medical community does not uniformly support the extreme restrictions of the Governor as reasonable necessary under the circumstances;

(f) irrational prolonging of the period during which a herd-immunity to the virus can develop, with no net saving of human life, unless substantially more effective treatments or vaccines become available;

(g) the fact that other jurisdictions, within the United States and abroad, pursuing less restrictive business closing practices have not been overwhelmed with COVID-19 cases.

53.    The Governor has a mechanism under the Oregon Constitution to assert emergency powers upon the declaration of a "catastrophic disaster," including a "public health emergency, set forth in Article 10-A, § 1.  Upon information and belief, she failed to exercise this option because it required consultation with the Legislature, and would not extend the emergency restrictions beyond thirty days unless extended by the Legislature or because the COVID-19 has not resulted in "extraordinary levels of death" in Oregon within the meaning of the Oregon Constitution, Article X-A, § 1(a).  The Governor has purported to exercise purely statutory powers, including, pursuant to ORS 401.168, "all police powers vested in the State by the Oregon Constitution".

Page 17:        PLAINTIFFS' COMPLAINT

54.     Upon information and belief, defendants' decision to extend the restrictions until July 6, 2020, was not made in in a neutral, good faith, and objective manner, but contaminated by collateral motives to benefit the electoral prospects of the Governor's political party in the upcoming presidential election, and to advance that party's ideology of larger government programs, spending and control over Americans. The bases of this belief include:

(a)     The failure to engage in widespread antibody testing in Oregon where such tests have been available and employed in other states since early April;

(b)     The refusal to acknowledge the fourteen-day limit (subject to renewal) for "public health emergencies" set forth in ORS 443.441(5), based on an older, more general emergency statute without such time limit, ORS 401.168;

(c)     The refusal to incorporate the best available scientific information concerning much lower fatality rates than measured by deaths in cases severe enough to require testing

(d)     The refusal to weigh countervailing costs of restrictions in decision making (including economic and noneconomic costs); and

(e)     The Governor's purported joinder of a Western States Pact, in probably violation of the Compact Clause of the U.S. Constitution, consisting of Oregon, Washington, and California, later joined by Colorado and Nevada, whose governors have all exercised similar and excessive emergency powers and are members of the same political party; and

(f)     The disproportionate economic impact of the Governor's shutdown orders upon members of the opposite political party to that of the Governor.

55.    For some time prior to the filing of this suit, Plaintiffs should have been able to decide for themselves whether to "shut down" if their businesses/business models were not equipped to properly deal with health and safety guidelines issued by Oregon and the federal government in connection with COVID-19.

### FIRST CLAIM FOR RELIEF (42 U.S.C. § 1983)

56.    Plaintiffs reallege paragraphs 1 through 55as if incorporated herein

57.    The foregoing restrictions subject plaintiff thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States, in violation of 42 U.S.C. § 1983, including but not limited to:

(a)    The substantive right to Due Process of Law under the Fourteenth Amendment, which protects plaintiffs' fundamental property interests in conducting lawful business activities, which was violated by defendants as alleged herein.

(b)    The procedural right to Due Process of Law under the Fourteenth Amendment, which defendants violated by ordering the closure of plaintiffs' businesses, without a constitutionally-adequate opportunity for a hearing to present plaintiffs' cases for why their businesses should not be shut down.

(c)    The Equal Protection Clause rights secured by the Fourteenth Amendment, which defendants violated by arbitrarily categorizing Oregon businesses and conduct as either essential or non-essential.

(d)    The Fourth Amendment right to be free of unreasonable seizures of property, which defendants violated by shuttering plaintiffs' businesses;

Page 19:    PLAINTIFFS' COMPLAINT

(e)     The Fifth Amendment prohibition on taking private property for public use without just compensation, which defendants have violated by seizing plaintiffs' business and taking them for the asserted public use of risk minimization, denying Plaintiff's use of their licenses to operate their businesses and depriving Plaintiffs the use of their real and personal property.

58.     Given the fundamental nature of the rights abridged by defendants, the legality of their actions should be evaluated under "strict scrutiny" can be justified only if it furthers a compelling government purpose, and, even then, only if no less restrictive alternative is available.  Less restrictive alternatives include such alternatives as requirements for participants in business or other activities to wear masks, follow hygienic practices, and require a measure of distance between customer and business where feasible.  Less restrictive alternatives exist because the State can limit itself to imposing draconian restrictions only upon businesses where layouts, structure configurations, hygiene and cleaning procedures which factually pose unreasonable risks of danger of exposure or spread of COVID-19.

59.     The Governor's restrictions are also afflicted with substantial overbreadth in light of the fundamental rights abridged by the orders.  For example, the order closes "indoor and outdoor malls (*i.e*., all portions of a retail complex containing stores and restaurants in a single area)," thereby destroying individual businesses for example such as Plaintiff Saldana and Karpontinis' businesses that happen to be located in a single building, or in a strip mall even if each building has a separate, outdoor entrance, and the business is not among the more specific classes of personal service businesses.  The Governor's restrictions "close" businesses which derive revenue from such things as

renting or leasing real property to other businesses, by closing physical real property and banning and prohibiting individuals like Plaintiff David Parson from leasing his space to individuals, even though such businesses could serve one individual at a time.

60.    The conduct challenged herein is sufficiently offensive to fundamental constitutional rights that it does not withstand scrutiny even under more deferential standards of judicial review.

61.    Plaintiffs have no adequate remedy at law, but require injunctive relief to prevent immediate irreparable injury.  Specifically, plaintiffs are threatened with fines and criminal prosecution for violation of the foregoing Executive Orders. Plaintiffs Parson, Karpontinis, and Saldana have made demands for a hearing, post deprivation and have not been offered any notice or opportunity to be heard regarding their deprivations.

62.    Pursuant to 42 U.S.C. §§ 1983 and 1988, Plaintiffs are entitled to declaratory relief and temporary, preliminary, and permanent injunctive relief invalidating and restraining enforcement of the Orders.

63.    Plaintiffs found it necessary to engage the services of private counsel to vindicate their rights under the law. Plaintiffs are therefore entitled to an award of reasonable attorneys' and expert fees pursuant to 42 U.S.C. § 1988.

**Prayer for Relief**

Wherefore, plaintiffs pray for:

1.    A judgment declaring that the Governor's Executive Order Nos. 20-07 and 20-12, are null and void, of no effect, insofar as those orders forbid the operation of Oregon businesses.

Page 21:    PLAINTIFFS' COMPLAINT

2.    A judgment and orders temporarily, preliminarily, and finally enjoining defendants, and all those in active concert or participation with them, from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with Executive Order No. 20-07 and Executive Order No. 20-12, insofar as those orders forbid the operation of Oregon businesses.

3.    For their costs and reasonable attorneys' and expert fees incurred in this action; and

4.    For such other and further relief as may be just and proper.

DATED:  May 12, 2020.

/s/  James L. Buchal
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP3425 SE
Yamhill Street, Suite 100
Portland, OR  97214
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com
*Attorney for Plaintiffs Open Our Oregon,*
*Da Cielo LLC, The Mount Hood Mixer*
*Shop, Inc., Under The Skin Tattoo LLC,*
*Bryant LLC, and  Kuebler's Furniture, Inc.*

/s/ Tyler Smith
Tyler Smith, OSB No. 75287
TYLER SMITH & ASSOCIATES PC
181 N. Grant St. Suite 212
Canby, OR  97013
Tel:  503-266-5590
Fax:  503-213-6392
E-mail:  tyler@ruralbusinessattorneys.com
*Attorney for Plaintiffs Kathy Saldana,*
*Michele Karpontinis, and David Parson*

I hereby attest that I have on file all holographic signatures corresponding to any signatures indicated by a conformed signature (/s/) within this e-filed document.

/s/ James L. Buchal

Page 22:    PLAINTIFFS' COMPLAINT