James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP
3425 SE Yamhill Street, Suite 100
Portland, OR  97214
Tel:  503-227-1011
Fax:  503-573-1939
E-mail:  jbuchal@mbllp.com
*Attorneys for Plaintiffs (see signature block)*

Tyler Smith, OSB No. 75287
TYLER SMITH & ASSOCIATES PC
181 N. Grant Street, Suite 212
Canby, OR 97013
Tel:  503-266-5590
Fax:  503-213-6392
E-mail:  tyler@ruralbusinessattorneys.com
*Attorney for Plaintiffs (see signature block)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| OPEN OUR OREGON, DA CIELO LLC, THE MOUNT HOOD MIXER SHOP, INC., UNDER THE SKIN TATTOO LLC, BRYANT LLC, KUEBLER'S FURNITURE, INC., KATHY SALDANA, as an individual; MICHELE KARPONTINIS, as an individual; and DAVID PARSON, as an individual, <br><br> Plaintiffs, <br><br> v. <br><br> KATE BROWN, in her official capacity as the Governor of the State of Oregon, LILLIAN SHIRLEY, in her official capacity as Public Health Director of the State of Oregon, <br><br> Defendants. | No. <br><br> **PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF** |

Page 1: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

**TO THE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE THAT plaintiffs Open Our Oregon, Da Cielo LLC, The Mount Hood Mixer Shop, Inc., Under The Skin Tattoo LLC, Bryant LLC, Kuebler's Furniture, Inc., Kathy Saldana, Michele Karpontinis, and David Parson, through counsel, will and hereby do apply to this Court pursuant to Fed. R. Civ. P. 65(b) and Local Rule 65 for a temporary restraining order against Defendants Kate Brown, in her official capacity as the Attorney General of the State of Oregon, and Lillian Shirley, in her official capacity as Public Health Director of the State of Oregon and for the issuance of an order to show cause why a preliminary injunction should not issue, as follows:

1.      Restraining and enjoining defendants and all those in active concert with them from enforcing, attempting to enforce, threatening to enforce, or otherwise requiring compliance with Executive Order No. 20-07 and Executive Order No. 20-12, insofar as those orders forbid the operation of Oregon businesses.

2.      Defendants shall show cause, at a time and place to be directed by the Court, why a preliminary injunction should not issue requiring Defendants to act as described above; the temporary restraining order shall remain effect until such time as the Court has ruled on whether a preliminary injunction should issue.  Such relief is necessary to prevent defendants from further violating plaintiffs' constitutional rights, pending trial on the merits of plaintiff's claims.

Page 2: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

This Application is made on the grounds that Plaintiffs are likely to succeed on the merits of this case, they will suffer irreparable harm without injunctive relief, the balance of equities tips sharply in their favor, and the relief sought is in the public interest.

Good cause exists to issue the requested Order to preserve Plaintiffs' rights under the Constitution of the United States, and to avoid irreparable harm to those rights. This Application is supported by the accompanying Memorandum, by Plaintiffs' Complaint, by the declarations of Plaintiffs and their counsel, James L. Buchal and Tyler Smith, and their expert witness, Dr. Thomas Dodson, and by such further argument and evidence that may be adduced at any hearing on this matter or of which the Court may take judicial notice.

The Complaint in this action was filed concurrently with this Application. All papers relating to this Application will be delivered by email to counsel for the Oregon Attorney General by 5:00 p.m. on May 12, 2020.  As reflected in the accompanying declaration of Tyler Smith, Plaintiffs have notified the Office of the Attorney General of Plaintiffs' intention to file this Application and to seek a temporary restraining order of the nature described above.

Plaintiffs request that the Court waive any bond requirement, because enjoining Defendants from interfering with the constitutional rights of Plaintiffs will not financially affect Defendants.

DATED:  May 12, 2020.

/s/  James L. Buchal
James L. Buchal, OSB No. 921618
MURPHY & BUCHAL LLP3425 SE
Yamhill Street, Suite 100
Portland, OR  97214
Tel:    503-227-1011
Fax:    503-573-1939
E-mail:   jbuchal@mbllp.com
*Attorney for Plaintiffs Open Our Oregon,*
*Da Cielo LLC, The Mount Hood Mixer*
*Shop, Inc., Under The Skin Tattoo LLC,*
*Bryant LLC, and Kuebler's Furniture, Inc.*


/s/ Tyler Smith
Tyler Smith
Tyler Smith & Associates PC
181 N. Grant St. Suite 212
Canby, OR 97013
Phone:  503-266-5590
Fax:  503-213-6392
E-mail:  tyler@ruralbusinessattorneys.com
*Attorney for Plaintiffs Kathy Saldana,*
*Michele Karpontinis, and David Parson*

**MEMORANDUM IN SUPPORT OF APPLICATION**

**TABLE OF CONTENTS**

Table of Authorities ...............................................................................................6

Preliminary Statement.........................................................................................10

Statement of Facts................................................................................................12

A.    The General Lack of Justification of, and Extraordinary Harm
      from, the Orders ..........................................................................................13

B.    Facts Specific to Particular Plaintiffs.......................................................16

C.    The Governor's Re-Opening Plan ............................................................17

Argument ...............................................................................................................19

I.    THE REQUESTED TEMPORARY RESTRAINING ORDER SHOULD
      ISSUE ...........................................................................................................19

      A.    Legal Standard for Issuance.................................................................20

      B.    Plaintiffs Demonstrate Violation of their Fundamental Constitutional
            Rights .....................................................................................................21

            1.    The Substantive Due Process Rights to Engage in Business.........22

            2.    Procedural Due Process Rights ..................................................26

            3.    Equal Protection of the Laws......................................................29

            4.    Fourth and Fifth Amendment Rights ............................................31

      C.    The General Effect of an Emergency on Constitutional Rights ...............32

Conclusion .............................................................................................................37

## TABLE OF AUTHORITIES

**Cases**

*Adams & Boyle, P.C. v. Slatery*,
   No. 20-5408, 2020 U.S. App. LEXIS 13357 (6th Cir. Apr. 24, 2020)................36

*Allgeyer v. Louisiana*,
   165 U.S. 578, 589, 17 S. Ct. 427 (1897)................................................23

*Alliance for Wild Rockies v. Cottrell*,
   632 F.3d 1127 (9th Cir. 2011) ...............................................................21

*Bell v. Burson*,
   402 U.S. 535, 91 S. Ct. 1586 (1971)......................................................26

*Cleveland Bd. of Educ. v. Loudermill*,
   470 U.S. 532, 105 S. Ct. 1487 (1985).....................................................26

*Dunn v. Blumstein*,
   405 U.S. 330 (1972)............................................................................33

*Earth Island Inst. v. United States Forest Serv.*,
   351 F.3d 1291, 1297 (9th Cir. 2003) ......................................................20

*Exxon Corp. v. Governor of Md.*,
   437 U.S. 117, 98 S. Ct. 2207, 2213 (1978).............................................25

*Ex parte Arta*,
   52 Cal. App. 380 (1921) ......................................................................33

*Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*,
   415 U.S. 423 (1974)............................................................................20

*Hebert v. Louisiana*,
   272 U.S. 312, 47 S. Ct. 103 (1926)........................................................23

*Hill v. Borough of Kutztown*,
   455 F.3d 225 (3d Cir. 2006).................................................................27

*H&R Grenville Fine Dining, Inc.*,
   2011 U.S. Dist. LEXIS 145447 ............................................................26

*Jacobson v. Commonwealth of Massachusetts*,
    197 U.S. 11 (1905)................................................................33, 34, 35, 36

*Jew Ho v. Williamson*,
    103 F. 10 (C.C. Cal. 1900)..............................................................32, 33

*Kentucky Dep't of Corrections v. Thompson*,
    490 U.S. 454, 109 S. Ct. 1904 (1989)..................................................28

*Kimball Laundry Co. v. United States*,
    338 U.S. 1 (1949)..............................................................................31

*Korematsu v. United States*,
    323 U.S. 214 (1944)..........................................................................33

*Maher v. Roe*,
    432 U.S. 464, 488 (1977)..................................................................33

*Memorial Hospital v. Maricopa County*,
    415 U.S. 250 (1974)..........................................................................33

*New York Times Co. v. United States*,
    403 U.S. 713 (1971)..........................................................................36

*Prince v. Massachusetts*,
    321 U.S. 158 (1944)..........................................................................21

*Roberts v. Neace*,
    slip op. No. 20-5465, (Sixth Cir. May 9, 2020)....................................30

*Rochin* v. *California*,
    342 U.S. 165, 172 (1952)..............................................................23, 24

*Sea Girt Restaurant & Tavern Owners Asso., v. Borough of Sea Girt*, New Jersey,
    625 F. Supp. 1482 (D.N.J. 1986)..................................................26, 27

*Sinaloa Lake Owners Asso. v. Simi Valley*,
    882 F.2d 1398 (9th Cir. 1989) ..............................................19, 26, 31

*Soldal v. Cook Cty.*,
    506 U.S. 56, 113 S. Ct. 538 (1992)....................................................31

*Spinelli v. New York*,
    579 F.3d 160 (2d Cir. 2009)..............................................................27

Page 7: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*,
    240 F.3d 832 (9th Cir. 2001) ................................................................20

*Takahashi v. Fish & Game Com.*,
    334 U.S. 410, 68 S. Ct. 1138 (1948) ....................................................23

*Truax v. Raich*,
    239 U.S. 33, 36 S. Ct. 7 (1915) ...........................................................23

*United States v. Carolene Products*,
    304 U.S. 144 (1938) .............................................................................30

*United States v. General Motors Corp.*,
    323 U.S. 373 (1945) .............................................................................32

*United States v. Jacobsen*,
    466 U.S. 109, 104 S. Ct. 1652 (1984) ..................................................31

*United States v. Salerno*,
    481 U.S. 739, 107 S. Ct. 2095 (1987) ..................................................23

*Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*,
    547 F.2d 938 (5th Cir. 1977) ...............................................................27

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) .................................................................................20

*Wong Wai v. Williamson*,
    103 F. 1 (CC Cal. 1900) .......................................................................32

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) .............................................................................29

*Zinermon v. Burch*,
    494 U.S. 113, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990) ....................28

**Federal Statutes**

42 U.S.C. § 1983.............................................................................................21, 27

**State Statutes**

ORS 183.310(6)........................................................................................................28

ORS 183.310(9)(e)..................................................................................................28

ORS 401.032(2)........................................................................................................

ORS 401.168...............................................................................................................

ORS 401.990...............................................................................................................

ORS 433.441(5).........................................................................................................

**Federal Rules and Regulations**

Fed. R. Civ. P. 65(b) ...............................................................................................2

Fed. R. Civ. P. 65(b)(1)..........................................................................................20

**Other Authorities**

Executive Order No. 20-07 ...............................................................................2, 22

Executive Order No. 20-12 ...............................................................................2, 22

Oregon Const. Art. IV..........................................................................................29

Oregon Const. Art. X ...........................................................................................25

U.S. Const. Art. 4, § 4...........................................................................................29

## Preliminary Statement

The United States Constitutions do not contain a pandemic or emergency clause, and defendants may not run roughshod over fundamental Constitutional principles of liberty and justice with bare assertion that a health crisis requires such action. In an overreaching response to the COVID-19 pandemic, Defendants have criminalized the operation of so-called "non-essential" businesses across Oregon.  This action does not concern the wisdom of all of the Governor's initial Emergency Orders,[1] or even the initial imposition of any of them.  But the Governor's  May 1, 2024 Executive Order No. 20-24, extending the total destruction of the businesses and economic fortunes of nearly one in six Oregonians until July 6, 2020, must be examined in light of the total evaporation of the announced need for the restrictions in the first place:  to avoid overwhelming Oregon health care facilities.  At this juncture, with the evidence clear that the peak in hospitalizations never threatened any such thing, and is long past, the Governor's unprecedented quarantining of healthy Oregonians totally abrogates the fundamental rights and liberties enshrined by the U.S. Constitution, and cannot be sustained.

Inasmuch as there is no vaccine against COVID-19, and may never be, the only probable path to community protection is "herd immunity," in which a critical mass of resistant, previously-infected individuals emerge to block further transmission of the disease.  There is no reasonable path through which the disease simply vanishes as a result of lockdown orders, and the Governor's Orders are inflicting catastrophic economic

---

[1] They are all available on https://www.oregon.gov/gov/admin/pages/executive-orders.aspx.

Page 10: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

damage on the economy for no reasoned purpose.  To make matters worse, with the catastrophic economic damage comes immense human suffering and death, which is completely ignored by the Governor.

Not since *Korematsu v. United States*, 323 U.S. 214 (1944), have such flimsy assertions of risk shut down the businesses and ruined the lives of healthy, law-abiding Americans, and this Court may reasonably expect in the fullness of time to see the Governor's extended lockdowns as standing on the same moral plain.  It is especially offensive to see wealthy, white collar elites who can work at home and weather financial hardship demand that poorer Americans with hand-to-mouth service jobs be quarantined while healthy because of the infinitesimal risks they pose.  The very concept of inalienable rights was designed to protect Americans from the exercise of such arbitrary power, and the Governor's Executive Orders challenged herein are an unprecedented attack on fundamental rights.

Most of the Plaintiffs operate businesses which, unlike marijuana dispensaries and tribal card rooms, have been identified by the Governor as posing levels of risk sufficient to justify a total shutdown order.  Others have been indirectly damaged.  None stand accused of having employees afflicted with COVID-19, of operating in any particularly risky nature, or indeed having any special characteristics at all.  The mere fact that they involve personal contact between employees and customers is the only basis for the assertion of risk.  On that theory, Americans have no inalienable rights and anything can be banned on the basis of "risk".  To make matters worse, the asserted risks are posited

Page 11: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

by historically unreliable statisticians, and there is no consensus in the medical community as to the wisdom of continued shutdowns.

This is not a smallpox epidemic, where a third of the people might die, and even more of the babies, if the disease were allowed to spread. And even back then when serious health emergencies posed such threats, no one ever contemplated shutting down entire states. There are any number of less restrictive alternatives that can focus upon the most vulnerable populations. The relief sought by plaintiff will not prevent the Governor from reasonable regulation that falls short of a total abrogation of Constitutional rights.

But Defendants' total shutdown orders violate plaintiffs' fundamental rights to due process of law (substantive and procedural), equal protection of law, and the Fourth or Fifth Amendments. This Court should immediately enjoin Defendants from further violating Plaintiffs' core liberties.

### Statement of Facts

As set forth in the Complaint (¶¶ 14-32) and accompanying Declarations, the Governor and the Public Health Director of the State of Oregon have responded to the spread of COVID-19 with an extraordinary sequence of Executive Orders and emergency regulations, designed to minimize personal conduct between Oregonians so as to minimize the risks of spreading COVID-19. In substance, the Orders shut down a wide swath of Oregon businesses the Governor deemed non-essential and associated with personal contact between business employees and customers. Over time, it has become apparent that the disease is far less fatal than initially imagined.

Page 12: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

**A.**     **The General Lack of Justification of, and Extraordinary Harm from, the Orders.**

At the outset, it is important to understand that the State's own data show that the initially-stated rationale for the Executive Orders, the need avoid overwhelming the State's emergency medical facilities, was itself a bad forecast that never came to pass. The peak in emergency room usage is long past.  (Buchal Decl. ¶ 2 (referring to Cmplt. ¶ 39).)

Thomas Dodson, M.D., past president of an Oregon medical association, professor at OHSU, and on several hospital staffs, offers extensive testimony that:

o   We now know that Oregon's health system can cope with COVID-19, and that early estimates of fatality rates have dropped to 0.8 to 0.94%.  (Dodson ¶ 2);

o   As a practical matter, we cannot eradicate COVID-19 (*id*. ¶ 3);

o   There is no consensus within the medical community that the challenged provisions are necessary; rather, Oregon's decisionmaking has been driven by statistical modelling of possible disease spread (*id*. ¶ 4);

o   Oregon fatalities per unit population remain very low in comparison with other jurisdictions, and more importantly, are far, far below numerous other health issues (*id*. ¶ 5);

The State's own current data shows a very large surge capacity available to handle COVID-19 patients, including ample ventilators.  (Buchal Decl. ¶ 2 (referring to Cmplt. ¶ 39).)

There can be no dispute as to the economic suffering for small businesses and employees in Oregon, with public reports saying that one in six Oregonians have lost

Page 13: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

their jobs as a result of these actions.  M. Rogoway, "Oregon says it is prioritizing thousands of jobless claims still pending from March," *The Oregonian*, May 6, 2020.[2] Since and including the week of March 21st, following the Governor's March 17th Executive Order shutting down "restaurants, bars, taverns, brew pubs, wine bars, cafes, food courts, coffee shops, clubs or other similar establishments that offer food or drink," Oregonians have filed over 360,000 claims for unemployment, and the state has been overwhelmed and unable to process or pay many of them.  *See id.*

With this economic suffering comes health impacts of nearly unimaginable magnitude.  Dr. Dodson explains that against any health benefits from destroying Oregon business must be counted countervailing increases in emotional, mental and behavioral illnesses, including alcohol and drug abuse, suicide, domestic violence and child abuse. (*Id*. ¶¶ 7-11.)  The increased suicides reasonably to be expected from the Governor's lockdown orders are of the same order of magnitude, if not even larger, that total COVID-19 deaths so far.  (*Id*. ¶ 10 (46-432 increased deaths); see also *id*. ¶ 13 ("It is likely that suicide, homicide, child abuse, alcoholism, drug use, and criminality will increase because of the stress associated with a government, deeply in debt, which can't prove that it will put food on the table, pay a mortgage or rent, and provide employment").  It should shock the Court to find that the rubric of reducing the risk of infection—largely to vulnerable populations who can protect themselves and assume

---

[2] Available at https://www.oregonlive.com/business/2020/05/oregon-says-it-is-prioritizing-thousands-of-jobless-claims-still-pending-from-march.html (accessed May 6, 2020).

Page 14: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

risks if they go out unprotected during these times—the Governor has in substance sentenced many Oregonians to death and misery.

Approximately 127 Oregonians have died of COVID-19 so far.  (Buchal Decl. ¶ 2 (referring to Cmplt. ¶ 43).)  To put the significance of these deaths in context, as compared to other causes of death in Oregon, a 2018 OHA report shows thirteen other causes of death were more significant, ranging from malignant neoplasm (4,349) to Septicemia (117).  (*Id.*)  There were 643 alcohol-induced deaths, but we do not declare a public emergency and ban the sale of alcohol.  There were 243 influenza and pneumonia deaths, but no emergency was declared over the seasonal flu.

Historical comparison also suggest that the Governor's orders are truly extraordinary, and a departure from all prior disease episodes in American history.  The 1957 flu epidemic is estimated to have killed approximately 116,000 Americans, which scaled up to today's population would represent approximately 221,000 deaths. Similarly, the 1968 flu epidemic is estimated to have killed approximately 100,000 Americans, or 165,000 based on today's population.  Even if total COVID-19 fatalities may ultimately exceed these numbers, in neither prior case were restrictions placed upon the livelihoods and fundamental constitutional rights of ordinary Americans.  How can it be that our Constitutional rights are so fragile that they may be ripped to shreds on the basis of risks that formerly stirred no executive to action at all?

There is ample ground for narrower, well-supported emergency measures.  For example, 44% of Oregon deaths have involved patients over the age of eighty.  The

Page 15: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

Washington Post has reported that about one-third of national fatalities from COVID-19 are residents of a long-term care facility, and that the true percentage may be one-half.[3] There are obviously important and sensible public health restrictions that can and do protect this vulnerable group, such as the restrictions on visitation in nursing, assisted living, and residential care facilities which plaintiffs do not challenge.

A final consideration in evaluating the degree to which the emergency police power of Oregon should be permitted to eviscerate fundamental Constitutional rights concerns the absence of any coherent long-term rationale for the restrictions. Unless a treatment of 100% efficacy and/or vaccine of 100% efficacy were developed, the continued spread of the virus is inevitable, and slowing it down to such a substantial degree below the capacity of the health care system offers no coherent public health benefits, while creating extraordinary economic harms, and other mortality, such as suicides.

**B.      Facts Specific to Particular Plaintiffs.**

Plaintiff Kuebler's Furniture, Inc. had to shut down its furniture store in Salem and lay off eleven employees. (Kuebler Decl.) Plaintiff Da Cielo LLC operates Sola Salon Studios in the Pearl District, and the shut down—even as the State demands continuing licensing fees for operation, has left its owner Teri Schudel fearful for her economic future as her business is destroyed and bills mount. (Schudel Decl.) Plaintiff Under the Skin Tattoo LLC operated a tattoo and body piercing studio in Hood River,

---

[3] https://www.washingtonpost.com/news/powerpost/paloma/the-health-202/2020/05/07/the-health-202-nursing-home-residents-may-account-for-one-half-of-all-u-s-coronavirus-deaths/5eb2dc6d88e0fa42c41b3acf/ (accessed May 9, 2020).

Page 16: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

Oregon, and has already been forced to relinquish its lease after (Dawson Decl.)  Plaintiff David Parson operated a 24-hour gym, PDX Muscle, in Beaverton, Oregon, until shut down.  (Parson Decl.)

Plaintiff Bryant LLC operates the Why Not Bar & Grill in Yoncalla, a small town of about 1,200 people in Douglas County.  They have been unable to mitigate the Governor's Orders by offering takeout food, and stand to lose their entire business.  (Bryant Decl.)  Similarly, plaintiff Kathy Saldana operated two bars, Quins Bar in Ontario, Oregon and the A Street Tavern in Vale, Oregon.  (Saldana Decl.)

Finally, the ripple effects of the Governor's Orders spread far beyond the businesses directly shut down to other local businesses.  Plaintiff Hood River Mixer Shop, Inc. operates liquor stores in Hood River and The Dalles, and has lost all its bar and restaurant accounts.  Plaintiff Michele Karpontinis operated a retail store, Lotus House, selling lingerie in Roseburg, Oregon, and had to close because she was in a building that fell within the Governor's shutdown of malls.  (Karpontinis Decl.)  Plaintiff Open Our Oregon represents multiple businesses seeking to re-open.  (Ayles Decl.)

C.    **The Governor's Re-Opening Plan.**

The Governor's most recent plan, issued May 7, 2020, begins by emphasizing the failure to balance interests, with exclusive focus upon COVID-19 risks to the exclusion of all other factors, by saying:  "You don't make the timeline.  The virus makes the timeline."  (Buchal Decl. Ex. 1, at 2.)  The plan acknowledges that "we will be living with the virus" for "many months," and appears to suggest that substantial restrictions are required unless and until there is "reliable treatment or prevention" (*id.* at 4)—which may

Page 17: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

never occur.  It asserts that every restriction lifted will "increase cases" with no attempt to quantify the magnitude of such risk.  (*Id.*)

The plan does not suggest any removal restrictions until May 15th, which may occur in "some counties." (*Id.* at 8.)  At that point, and only in those counties, some restrictions may lift on "stand-alone retail that was previously closed but can follow OSHA guidelines:  furniture stores, art galleries, jewelry shops and boutiques".  (*Id.* at 10.)  Restaurants and bars may be able to open in limited way.

However, unreasonably stringent requirements are imposed even to trigger this Phase I.  (*Id.* at 12-13.)  And no further restrictions will be lifted for at least three more weeks (Phase II).  (*Id.* at 17.)  The Governor has offered essentially no further details on a Phase II, or a Phase III and warns that larger gatherings—even outdoors—are unlikely to be allowed until September.  (*Id.* at 21.)   As of this writing, no businesses have been opening, and the irreparable injuries continue to mount.

* * *

Ultimately, the balance struck by defendants *in the challenged restrictions* is so obviously a restriction on the most fundamental constitutional rights, with such intangible benefits to the public health, as to constitute a step too far toward the arbitrary and tyrannical government the Constitution was designed to prevent.  As a justice of the Wisconsin Supreme Court remarked during a May 4, 2020 challenging similar orders of the Governor of Wisconsin:  "Isn't it the very definition of tyranny for one person to order

people to be imprisoned for going to work among other ordinarily lawful activities?"[4]  As

formerly-hardworking Oregonians suffer under what amounts to a State-wide house

arrest, unable to do little more than emerge from their homes for a stroll, they cry out for

an adult authority who will put an end to the notion that Oregonians may be herded like

cattle under the delusion that disease can be eliminated from the herd.

## Argument

I.    **THE REQUESTED TEMPORARY RESTRAINING ORDER SHOULD ISSUE.**

As the Ninth Circuit has explained,

> The exercise of emergency powers is particularly subject to abuse. Emergency decision-making is, by its nature, abbreviated; it normally does not admit participation by, or input from, those affected; judicial review, as this case illustrates, is often greatly curtailed or non-existent. Exigent circumstances often prompt actions that severely undermine the rights of citizens, actions that might be eschewed after more careful reflection or with the benefit of safeguards that normally constrain governmental action.

*Sinaloa Lake Owners Asso. v. Simi Valley*, 882 F.2d 1398, 1410 (9th Cir. 1989)

(breaching of allegedly unsafe dam).  This case is akin to *Sinaloa*, in which there may

have been an initial emergency—severe rains raising water levels behind a dam—but the

challenged action occurred in a context where initial fears have been shown to be grossly

overstated.  Projections now suggest that COVID-19 will cause public health losses akin

to severe flu years in the past in which no emergency orders whatsoever were issued,

much less the sweeping orders challenged here.  Striking down the most unprecedented

and unreasonable of the Governor's restrictions, totally closing private businesses who

---

[4] https://www.jsonline.com/story/news/politics/2020/05/05/lawsuit-block-tony-evers-order-stay-home-before-supreme-court/3083757001/

Page 19: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

have no sickness or direct relation to the COVID-19 epidemic at all, leaves ample measures in place for protecting the most vulnerable Oregonians.

## A. Legal Standard for Issuance.

A temporary restraining order preserves the *status quo ante* and prevents irreparable harm until a hearing can be held on a preliminary injunction application. *See Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers*, 415 U.S. 423, 439 (1974). A temporary restraining order may be issued without providing the opposing party an opportunity to be heard where "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition," and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1).

The standards for issuing a temporary restraining order and a preliminary injunction are the same. *See, e.g., Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 839 n.7 (9th Cir. 2001). The Ninth Circuit has established two sets of criteria for evaluating a request for injunctive relief. *Earth Island Inst. v. United States Forest Serv.*, 351 F.3d 1291, 1297 (9th Cir. 2003). Under the "traditional" criteria, a plaintiff must show (1) a strong likelihood of success on the merits, (2) a likelihood of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest. *See, e.g., Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008). Alternatively, a temporary restraining order or preliminary injunction may be appropriate when a movant

Page 20: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

raises "serious questions going to the merits" and the "balance of hardships tips sharply in the plaintiff's favor," provided that the plaintiff is able to show there is a likelihood of irreparable injury and that the injunction is in the public interest. *Alliance for Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

We demonstrate below that all these requirements are met. Numerous Oregonians, including plaintiffs, stand to lose their businesses, undeniable irreparable injury, balanced against totally speculative assertions that closing their business will have some appreciable public benefit by minimizing (in the short run) the number of COVID-19 cases. By that logic, the Governor could arbitrarily shut down any activity at will because human contact inevitably involves risk. The public interest demands that this Court halt Oregon's slide into despotism.

### B. Plaintiffs Demonstrate Violation of their Fundamental Constitutional Rights.

Plaintiffs assert facial and as-applied challenges to the Executive Orders pursuant to 42 U.S.C. § 1983 on the basis of multiple violations of federal constitutional rights. They are at immediate threat of irreparable injury both from various threatened penalties set forth in ORS 401.990, which purports to treat violation of the Executive Orders as a Class C Misdemeanor under Oregon law. The law concerning constitutional rights in this context is frequently confused, with rapid shifts from one theory to another; the important point is that the Governor's orders are offensive to multiple fundamental Constitutional civil rights provisions.

No plaintiff here asserts any right "to expose the community . . . to communicable disease," *Prince v. Massachusetts*, 321 U.S. 158, 166–67 (1944), *but no plaintiff here has*

Page 21: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

*the disease.* We cross a vital barrier, ceasing to treat Oregonians as free citizens of

Republic and instead treating them as the State's chattel or cattle, when we restrict the

fundamental freedoms of *healthy* Oregonians based on asserted and highly generalized

risks. As Albert Camus said: "The welfare of the people in particular has always been

the alibi of tyrants, and it provides the further advantage of giving the servants of tyranny

a good conscience."

## 1.    The Substantive Due Process Rights to Engage in Business.

Executive Order No. 20-07, issued March 17, 2020, bans "restaurants, bars,

taverns, brew pubs, wine bars, cafes, food courts, coffee shops, clubs or other similar

establishments that offer food or drink" from "offer[ing] or allow[ing] on-premises

consumption of food or drink". Executive Order No. 20-12, issued March 23, 2020, shut

down a broad range of businesses "for which close personal contact is difficult or

impossible to avoid," including:

> "Amusement parks; aquariums; arcades; art galleries (to the extent that they are
> open without appointment); barber shops and hair salons; bowling alleys;
> cosmetic stores; dance studios; esthetician practices; fraternal organization
> facilities; furniture stores; gyms and fitness studios (including climbing gyms);
> hookah bars; indoor and outdoor malls (i.e., all portions of a retail complex
> containing stores and restaurants in a single area); indoor party places (including
> jumping gyms and laser tag); jewelry shops and boutiques (unless they provide
> goods exclusively through pick-up or delivery service); medical spas, facial spas,
> day spas, and non-medical massage therapy services; museums; nail and tanning
> salons; non-tribal card rooms; skating rinks; senior activity centers; ski resorts;
> social and private clubs; tattoo/piercing parlors; tennis clubs; theaters; yoga
> studios; and youth clubs."

The order provides no exceptions, no means of appeal, and, as discussed below, is

inherently arbitrary in nature: "non-tribal card rooms" are closed, but tribal card rooms

are not, when there is no evidence that Native Americans are immune from the disease.

Page 22: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF

Hardware stores are exempted; jewelry and furniture stores are not.  The list reflects more of the Governor's political judgments as to the public value of various enterprises than any careful examination of the means by which COVID-19 is transmitted:  primarily in homes and on public transportation (unaffected by the Orders).

As far back as 1897, it was recognized that the Fourteenth Amendment protected

"not only the right of the citizen to be free from the mere physical restraint of his person, as by incarceration, but the term is deemed to embrace the right of the citizen to be free in the enjoyment of all his faculties; to be free to use them in all lawful ways; to live and work where he will; to earn his livelihood by any lawful calling; to pursue any livelihood or avocation, and for that purpose to enter into all contracts which may be proper, necessary and essential to his carrying out to a successful conclusion the purposes above mentioned."

*Allgeyer v. Louisiana*, 165 U.S. 578, 589, 17 S. Ct. 427, 431 (1897); *see also Truax v. Raich*, 239 U.S. 33, 41, 36 S. Ct. 7, 10 (1915) ("the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the [Fourteenth] Amendment to secure"); *Takahashi v. Fish & Game Com.*, 334 U.S. 410, 416, 68 S. Ct. 1138, 1141 (1948).

As the Supreme Court has more recently explained, the Due Process Clause protects individuals against two types of government action in a *substantive* fashion:  it "prevents the government from engaging in conduct that 'shocks the conscience,' *Rochin* v. *California*, 342 U.S. 165, 172 (1952), or interferes with rights 'implicit in the concept of ordered liberty,' *Palko* v. *Connecticut*, 302 U.S. 319, 325-326 (1937)." *United States v. Salerno*, 481 U.S. 739, 746, 107 S. Ct. 2095, 2101 (1987); *see also Hebert v. Louisiana*, 272 U.S. 312, 316, 47 S. Ct. 103, 104 (1926) ("state action, whether through

Page 23: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

one agency or another, shall be consistent with the fundamental principles of liberty and justice which lie at the base of all our civil and political institutions").

Properly understood, the Governor's order continuing the lockdown until July 6, 2020 should "shock the conscious".  The immediate cause of the March orders, an erroneous forecast of overwhelming health facilities, never occurred, and the peak in utilization has long passed.  The notion that healthy Oregonians, operating businesses with healthy employees, should simply cease operations to limit the transmission of a disease akin to COVID-19 is shocking and unprecedented in American history.

The action was taken without regard to local conditions, without regard to protective measures businesses may implement, and without regard to all of the countervailing harms—including public health harms—that arise from destroying the lives of Oregon's working people.

Shutting down a huge portion of Oregon's economy based on an executive decision as to what business activities are essential or nonessential, thereby destroying longstanding lawful businesses that have operated for decades (*e.g.*, Kuebler Decl., Dawson Decl.), is far more "shocking" than the conduct in *Rochin*.  There, the state merely forced open the mouth of a single citizen who swallowed drugs in the presence of police officers to "remove what was there" and "forcibl[y] extract[ed] his stomach's contents".  *Rochin* v. *California*, 342 U.S. 165, 172 (1952).  The conduct here will drive untold numbers of individual citizens to take their own lives in despair as the enterprises or careers they have spent their lives building are arbitrarily destroyed, all to slow down the inevitable spread of a disease that, like any flu virus, cannot be effectively contained

Page 24: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

or eliminated.  Worse still, the development of "herd immunity" will be delayed,
prolonging the risk to vulnerable populations who could shelter themselves as younger,
healthier Oregonians be.

The Governor's continued shutdown of plaintiff's businesses is a violation of their
fundamental, substantive due process rights of freedom to earn a livelihood.  Never in
American history have such general, sweeping shutdown orders been issued for a threat
to public health that, it is now clear, is of the same order of magnitude as public health
threats that were never the subject of emergency orders—such as bad flu seasons in the
past.

Extended statewide action in a public health emergency is not even part of the
Governor's statutory authority under Oregon law.  When the Oregon Legislature when it
created specific authority for a "public health emergency" also provided that the state of
emergency could only last fourteen days, to be extended in fourteen-day increments. ORS
433.441(5).[5]  And when the people had their say, through a 2012 initiative that created
Article X-A of the Oregon Constitution, they demanded that the Governor convene and
consult the legislature.  Federal precedent declining broadly to interpret substantive due
process rights typically rests on the proposition that the Due Process Clause does not
empower the judiciary "to sit as a 'superlegislature to weigh the wisdom of legislation'.
*Exxon Corp. v. Governor of Md.,* 437 U.S. 117, 124, 98 S. Ct. 2207, 2213 (1978).  But

---

[5] In the most recent May 1st Order, the Governor has purported to exercise a general
"emergency" authority under an older, general statute (ORS 401.168), ignoring the
"policy and intent of the Legislative Assembly that preparations for emergencies and
governmental responsibility for responding to emergencies be placed at the local level"
(ORS 401.032(2)).

Page 25: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF

the authority here under review is *executive*, not legislative, and there is no legislative wisdom to which to defer.

Moreover, plaintiffs allege that the shutdowns have been taken for ulterior motives under the guise of protecting the public health, under circumstances where, for all we know, more people are dying in Oregon from shutdown related suicides than COVID-19. *See generally* Cmplt. ¶¶ 54(a)-(f). The Governor's extraordinary action suggest ulterior motives for prolonging the lockdown, with such motives "highly relevant" for purposes of assessing the substantive due process claim. *Sinaloa Lake Owners Assoc. v. Simi Valley*, 882 F.2d 1398, 1410 (9th Cir. 1989) ("Whether government officials invoked emergency powers when they knew, or well should have known, that no exigency justified use of such draconian measures, is therefore highly relevant in determining whether the government has violated the plaintiff's substantive due process rights.").

### 2.    Procedural Due Process Rights.

Many of the plaintiffs hold business licenses from the State of Oregon. A business license is a property interest entitled to procedural due process protection. *Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 543, 105 S. Ct. 1487 (1985) ("We have frequently recognized the severity of depriving a person of the means of livelihood."). Once issued, a license or permit "may become essential in the pursuit of a livelihood." *Bell v. Burson*, 402 U.S. 535, 539, 91 S. Ct. 1586 (1971); *see also, e.g.*, *H&R Grenville Fine Dining, Inc.*, 2011 U.S. Dist. LEXIS 145447, at 56 (finding a liquor license to be a property interest); *Sea Girt Restaurant & Tavern Owners Asso., v.*

Page 26: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

*Borough of Sea Girt*, New Jersey, 625 F. Supp. 1482, 1488 (D.N.J. 1986) (same); *Spinelli v. New York*, 579 F.3d 160, 169 (2d Cir. 2009) (holding business license, once granted, to be property interest for purposes of procedural due process); *Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977) ("[P]rivileges, licenses, certificates, and franchises... qualify as property interests for purposes of procedural due process.").

The Governor's Orders had the functional effect of arbitrarily revoking all these licenses with no notice, and no opportunity for any hearing.  Whether or not the orders might be initially sustained when issued two months ago, the Governor's May 1, 2020 decision to extend them until July 6, 2020 is clearly unconstitutional given the clear information concerning the nature of COVID-19 and its spread within Oregon by that date, and every day makes it clearer and clearer that no persuasive public health ground can support the categorical shutdown of plaintiffs' businesses (along with much of the State's economy).

Procedural due process involves a person's right to have notice and the right to be heard before, or at least promptly after, any significant deprivation of a protected property right by a state actor. To state such a claim under federal law pursuant to 42 USC § 1983, "a plaintiff must allege that (1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty, or property,' and (2) the procedures available to him did not provide 'due process of law.'" *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006). "The deprivation by state action of a constitutionally protected  interest in 'life, liberty, or property,' is not

Page 27: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of the law." *Zinerman v. Burch*, 494 U.S. 113, 125, 110 S. Ct. 975, 108 L. Ed. 2d 100 (1990).  In particular, this Court should focus on "whether the 'procedures attendant upon that deprivation were constitutionally sufficient.'" *See Kentucky Dep't of Corrections v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904 (1989).

The State of Oregon has offered no procedural options to shut-down businesses to challenge the Governor's action.  Oregon has state law procedures for judicial review of agency action, and the Governor may technically constitute an "agency" as an "officer authorized by law to make rules or issue orders," but the review scheme specifically defines the "rules" subject to review to *exclude* "Executive orders of the Governor".  ORS 183.310(9)(e).  Oregon's procedures allow review of "agency orders," but defines them to be "directed to a named person or named persons" rather than categorical imperatives of the type challenged here.  ORS 183.310(6).

The fundamental problem here does not involved interpretation of state law, which purport to delegate the Governor unreviewable power to the limits of "all police powers vested in the state by the Oregon Constitution" (ORS 401.168).  The problem here is that the Governor's arrogation of the power to destroy the livelihood of poor service industry workers throughout the State who are ready, willing and able to work for a living is an exercise of the police power that destroys fundamental rights guaranteed under the Constitution without continuing circumstances that could support continuing to rip that document to shreds.

Page 28: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

Indeed, the Governor's orders are an assault on the very concept of Republican Government (which the United States is bound to guarantee to plaintiffs, *see* U.S. Const. Art. 4, § 4.)  The Governor here has ignored legislative policy and timing limitations, in favor of the same sort of naked assertion of authority found wanting in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  Oregon's grant of executive power to the Governor no more authorized her detailed rulemaking than the Constitution's authorized the President to seize the Nation's steel mills in wartime:  "the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute.  The first section of the first article says that "All legislative Powers herein granted shall be vested in a Congress of the United States . . .".  *Youngstown,* 343 U.S. at 587-88; *cf.* Oregon Const. Art. IV, § 1 (same except for initiative and referendum powers).  We are now two months into a regime of Government utterly inconsistent with the fundamental guarantees provided by the Constitution.

### 3.     Equal Protection of the Laws.

The Orders and Defendants' enforcement thereof violate the Fourteenth Amendment, both facially and as-applied to Plaintiffs.  The Fourteenth Amendment of the Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." Equal protection requires the state to govern impartially—not draw arbitrary distinctions between businesses based solely on differences that are irrelevant to a legitimate governmental objection.

Defendants have intentionally and arbitrarily categorized Oregon businesses and conduct as either essential or non-essential. Those businesses classified as essential, or as

participating in essential services, are permitted to go about their business and activities

provided certain social distancing practices are employed. Those classified as "non-

essential," or as engaging in non-essential activities, are required to shut down and have

their workers stay in their residences, unless it becomes necessary for them to leave for

one of the enumerated "essential" activities.  There is a third, unenumerated category as

to which the Governor's guidance has been ambiguous.

> As the Sixth Circuit recently pointed out in a parallel context:
>
> "Assuming all of the same precautions are taken, why can someone safely walk
> down a grocery store aisle but not a pew?  And why can someone safely interact
> with a brave deliverywoman but not with a stoic minister?  The Commonwealth
> has no good answers.  While the law may take periodic naps during a pandemic,
> we will not let it sleep through one."

*Roberts v. Neace*, No. 20-5465, slip op. at 7 (Sixth Cir. May 9, 2020).  While the Sixth

Circuit was addressing restriction of in-person church services, the same arbitrariness

applies, for example, to the difference between marijuana stores and furniture stores.

While lower levels of scrutiny are sometimes applied to economic regulation, this

is no ordinary economic regulation relating to product quality (*cf. United States v.

Carolene Products*, 304 U.S. 144 (1938)).  This is an outright ban on entire classes of

perfectly lawful businesses, trades and occupations, selling perfectly lawful products and

providing perfectly lawful services, under circumstances that also invoke additional

protection for the disadvantaged "discrete and insular minorities" of Oregonians who

have had their careers and businesses destroyed.  *Carolene*, 304 U.S. at 152 n.4; Cmplt.

¶ 54.

Page 30: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF

Plaintiffs ask this Court to invoke strict scrutiny under the Equal Protection and Due Process Clauses because the Governor's Orders infringe on so many fundamental rights that extend far, far beyond bare economic or health regulation to represent an unprecedented interference in the life and liberty of Oregonians.  Defendants cannot satisfy strict scrutiny, because their arbitrary classifications are not narrowly tailored measures that further compelling government interests, for the reasons stated above.

### 4.      Fourth and Fifth Amendment Rights.

The Fourth Amendment protects against unreasonable seizures.  "A 'seizure' of property occurs when there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S. Ct. 1652, 1656 (1984).  Here, the Governor seized business property throughout the state for the ostensible purpose of minimize asserted public health risk, which was unprecedented, arbitrary, and unreasonable for all the reasons stated above. The Supreme Court has made it clear that the protections of the Fourth Amendment extend beyond bare private interests; "its protections go further, and often have nothing to do with privacy at all." *Soldal v. Cook Cty.*, 506 U.S. 56, 64, 113 S. Ct. 538, 545 (1992) (upholding Fourth Amendment claim for removal of tenant's trailer); *but see Sinaloa*, 882 F.2d at 1411 (claim should be asserted under Fifth Amendment, not Fourth Amendment).

It is clear from multiple cases that the Fifth Amendment also bars the seizure, even temporary, of business property unless just compensation is paid.  Cases include the condemnation of a laundry to be used by the military for the duration of World War II, *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949), or the condemnation of the

Page 31: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

unexpired term of a lease, *United States v. General Motors Corp.*, 323 U.S. 373 (1945), types of appropriation is characterized as a "temporary taking."  The State has offered no compensation, or even procedures for obtaining it, however, and is indeed invoking a new tax that will tax business gross revenues without regard to the massive losses incurred by reason of the Governor's orders.  The sharp conflict between the Governor's extraordinary orders and the plain language of multiple Constitutional provisions underscore the degree to which a federal remedy for the deprivation of plaintiffs' federal rights is appropriate.

### C.    The General Effect of an Emergency on Constitutional Rights.

A variety of strands of long-standing federal case law make it clear that confining *healthy* citizens to their homes and shutting down businesses because of the risks of infection disease violates fundamental constitutional rights.  In *Jew Ho v. Williamson*, 103 F. 10 (C.C. Cal. 1900), and *Wong Wai v. Williamson*, 103 F. 1 (CC Cal. 1900), the California courts found that there were more than 15,000 people living in the twelve blocks of San Francisco Chinatown who were to be quarantined because of nine deaths from bubonic plague. The courts found it unreasonable to shut down the ability of over 15,000 people to make a living because of nine deaths.

The court found it "purely arbitrary, unreasonable, unwarranted, wrongful, and oppressive interference with the personal liberty of complainant" who had "never had or contracted said bubonic plague; that he has never been at any time exposed to the danger of contracting it, and has never been in any locality where said bubonic plague, or any germs of bacteria thereof, has or have existed". *Jew Ho*, 103 F. 10 (C.C. Cal. 1900).  The

Page 32: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

citizens of Oregon stand on the same footing as the plaintiffs in *Jew Ho*; there is no evidence of COVID-19 in their immediate vicinity or reason to believe they will spread it.

California courts have found that "a mere suspicion [of a contagious disease], unsupported by facts giving rise to reasonable or probable cause, will afford no justification at all for depriving persons of their liberty and subjecting them to virtual imprisonment under a purported order of quarantine." *Ex parte Arta*, 52 Cal. App. 380, 383 (1921) (emphasis added).

When a government practice restricts fundamental rights, it is subject to "strict scrutiny" and can be justified only if it furthers a compelling government purpose, and, even then, only if no less restrictive alternative is available. *See, e.g. Memorial Hospital v. Maricopa County*, 415 U.S. 250, 257-258 (1974); *Dunn v. Blumstein*, 405 U.S. 330, 339-341 (1972); *Shapiro v. Thompson*, 394 U.S. 618, 89  1969), *Maher v. Roe*, 432 U.S. 464, 488 (1977).

Defendants are expected to invoke *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905), for support of emergency actions during a public health emergency that might otherwise be held violative of Constitutional rights.  It is important to understand a fact, overlooked by all federal courts currently addressing COVID-19 restrictions, that *Jacobson* involved the spread of smallpox, *which involved a risk of death of approximately 30%, with higher rates among the very young*. (Dodson Decl. ¶ 2.) By contrast, the risk of death from COVID-19, is more likely on the order of 1% or less for all age groups, and negligible for the young—more than thirty times lower.  By

Page 33: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

the time this case is heard, with increasing antibody testing, this estimate is likely to fall

again, showing COVID-19 to be hundreds of times less dangerous.[6]

    *Jacobson* also involved conduct by defendants that was well beyond any

reasonable medical dispute, with the Court noting

> "the facts that for nearly a century most of the members of the medical profession
> have regarded vaccination, repeated after intervals, as a preventive of smallpox;
> that while they have recognized the possibility of injury to an individual from
> carelessness in the performance of it, or even in a conceivable case without
> carelessness, they generally have considered the risk of such an injury too small to
> be seriously weighed as against the benefits coming from the discreet and proper
> use of the preventive; and that not only the medical profession and the people
> generally have for a long time entertained these opinions, but legislatures and
> courts have acted upon them with general unanimity."

*Id.* at 24.  In that context, the Supreme Court was able to determine that "the police power

of a State must be held to embrace, at least, such reasonable regulations *established*

*directly by legislative enactment* as will protect the public health and the public safety"

(*id.* at 25; emphasis added), and upheld the imposition of a five dollar criminal fine upon

Mr. Jacobson for refusing to compulsory vaccination in a particular locality where

smallpox was "prevalent" and "increasing" (*id.* at 27).

    It was important to the Court, and the deference that it gave to the statute, that the

Massachusetts legislature "could not properly abdicate its function to guard the public

health and safety. The state legislature proceeded upon the theory which recognized

vaccination as at least an effective if not the best known way in which to meet and

---

[6] For example, as of May 6, 2020, according to an authoritative website maintained by
Johns Hopkins University, there had been 1,315 COVID-19 fatalities in Los Angeles
County, California in the 27,386 reported cases, for a crude fatality rate of 4.72%.  But
the antibody testing shows 28 to 44 times as many actual cases as reported cases, driving
the actual fatality rate down to 0.17 to 0.11%—literally hundreds of times lower than
smallpox mortality.

Page 34: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF

suppress the evils of a smallpox epidemic that imperiled an entire population." *Id.* at 30-31.  Here, by contrast, the Oregon legislature has abdicated its function entirely, and simply purported to delegate the entire police power of the State of Oregon to the Governor.  ORS 401.168.  Absent legislative participation, the intense suffering of Oregonians from the Governor's Orders cannot effectively be communicated to Oregon government.

*Jacobson* also made it clear that there is no simple "states can do anything to fight disease" rule.  The *Jacobson* court was careful to note that the

> "acknowledged power of a local community to protect itself against an epidemic threatening the safety of all, might be exercised in particular circumstances and in reference to particular persons in such an arbitrary, unreasonable manner, or might go so far beyond what was reasonably required for the safety of the public, as to authorize or compel the courts to interfere for the protection of such persons."

*Id.* at 28.  Where, as here, 94% of the mortality is confined to the elderly—under circumstances where there are frequently many other causes of death now subsumed under a COVID-19 label—there is no reason to believe that restricting the fundamental freedoms of all Oregonians is required for the safety of the public.  The primary risk from COVID-19 is elderly individuals already suffering from complicating and serious underlying conditions.  Their lives are worthy of protection, but it is an unprecedented invasion of personal liberty and freedom to confine an entire population, rather than quarantining healthy individuals.

The violations of rights here are of a far more extreme character than the temporary injection with a vaccine, and the risks far, far lower than smallpox.  Many Oregon businesses will never reopen, and the harsh effects of the challenged measures

Page 35: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

will adversely affect the future of thousands of Oregonians for the rest of their lives. *Jacobson* agrees that where, as here, there "is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution." *Id.* at 31

During the 115 years since Jacobson was decided, the Supreme Court has developed a substantial and durable body of case law establishing, unequivocally, that a state's infringement of fundamental rights to the U.S. Constitution are subject to the most rigorous from of judicial scrutiny: strict scrutiny. *See, e.g., New York Times Co. v. United States*, 403 U.S. 713, 717 (1971) ("The word 'security' is a broad, vague generality whose contours should not be invoked to abrogate the fundamental law embodied in the First Amendment.").

Litigation in response to gubernatorial COVID-19 restrictions has distinguished *Jacobson*. As the Sixth Circuit very recently explained in overturning an order limiting the operation of abortion clinics (in order to preserve scarce supplies of personal protective equipment (PPE)), "asking a person to get a vaccination, on penalty of a small fine, is a far cry from forcing a woman to carry an unwanted fetus against her will for weeks, much less all the way to term". *Adams & Boyle, P.C. v. Slatery*, No. 20-5408, 2020 U.S. App. LEXIS 13357, at *26 (6th Cir. Apr. 24, 2020). So too are the restrictions of Jacobson a far cry from forcing small business owners to lose businesses they have spent a lifetime building, on the basis that even though healthy themselves, they might somehow become involved in spreading disease in the future.

Page 36: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE RELIEF

**Conclusion**

For the foregoing reason, defendants should be immediately enjoined from

enforcing, attempting to enforce, threatening to enforce, or otherwise requiring

compliance with Executive Order No. 20-07 and Executive Order No. 20-12, insofar as

those orders forbid the operation of Oregon businesses.

DATED:  May 12, 2020.

> /s/  James L. Buchal
> James L. Buchal, OSB No. 921618
> MURPHY & BUCHAL LLP3425 SE
> Yamhill Street, Suite 100
> Portland, OR  97214
> Tel:    503-227-1011
> Fax:    503-573-1939
> E-mail:  jbuchal@mbllp.com
> *Attorney for Plaintiffs Open Our Oregon,*
> *Da Cielo LLC, The Mount Hood Mixer*
> *Shop, Inc., Under The Skin Tattoo LLC,*
> *Bryant LLC, and Kuebler's Furniture, Inc.*
>
> /s/ Tyler Smith
> Tyler Smith, OSB No. 075287
> TYLER SMITH & ASSOCIATES PC
> 181 N. Grant Street, Suite 212
> Canby, OR 9 7013
> Tel:  503-266-5590
> Fax:  503-213-6392
> E-mail:  tyler@ruralbusinessattorneys.com
> *Attorney for Plaintiffs Kathy Saldana,*
> *Michele Karpontinis, and David Parson*

I hereby attest that I have on file all holographic signatures corresponding to any

signatures indicated by a conformed signature (/s/) within this e-filed document.

> /s/ James L. Buchal

Page 37: PLAINTIFFS' APPLICATION FOR TEMPORARY RESTRAINING ORDER
AND ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD
NOT ISSUE; MEMORANDUM IN SUPPORT OF MOTION FOR INJUNCTIVE
RELIEF